United States District Court
For the District of New Jersey

Rahman Fulton

v.

United States of America

Civ. No. 18-16526 (SRC)

RESPONSE TO MOTION TO VACATE, SET ASIDE OR CORRECT
SENTENCE PURSUANT TO 28 U.S.C. § 2255

CRAIG CARPENITO
UNITED STATES ATTORNEY
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

Daniel Shapiro
Assistant U.S. Attorney

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION .................................................................................... 1

STATEMENT OF FACTS ......................................................................... 2

A.   Factual History ........................................................................ 2

B.   Procedural History .................................................................. 6

   1.   The Trial ........................................................................ 7

   2.   The Appeal ..................................................................... 8

ARGUMENT ........................................................................................... 9

A.   Defense Counsel Was Not Ineffective with Respect to their Witness Selections at Trial ................................................. 10

B.   Fulton Cannot Relitigate the Trial under the Guise of an Ineffective Assistance Claim ................................................. 17

C.   Defense Counsel Was Not Ineffective For Any of the Other Stated Grounds ...................................................................... 20

D.   No Evidentiary Hearing is Necessary .................................... 23

CONCLUSION ....................................................................................... 28

**TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*Barry v. United States*,
   528 F.2d 1094 (7th Cir. 1976) ............................................................ 11, 24

*Bobby v. Van Hook*,
   558 U.S. 4 (2009) ........................................................................... 12

*Brown v. United States*,
   45 F. App'x 92 (3d Cir.2002).......................................................... 25

*Buehl v. Vaughn*,
   166 F.3d 163 (3d Cir. 1999) ...................................................... 10, 27

*Cullen v. Pinholster*,
   131 S. Ct. 1388 (2011) ............................................................... 9, 13

*Dalli v. United States*,
   491 F.2d 758 (2d Cir 1974) ........................................................ 11, 24

*Duncan v. Morton*,
   256 F.3d 189 (3d Cir. 2001) ....................................................... 11, 23

*Engle v. Isaac*,
   456 U.S. 107 (1982) ..................................................................... 20

*Forbes v. United States*,
   No. 3:09CV806 AWT, 2014 WL 799002 (D. Conn. Feb. 27, 2014).......... 11, 23

*George v. Sively*,
   254 F.3d 438 (3d Cir. 2001) ........................................................... 10

*Gov't of Virgin Islands v. Forte*,
   865 F.2d 59 (3d Cir.1989) ............................................................. 24

*Gov't of Virgin Islands v. Nicholas*,
   759 F.2d 1073 (3d Cir.1985) .......................................................... 20

*Harrington v. Richter*,
   131 S. Ct. 770 (2011) ............................................................... 12, 13

*Hinton v. Alabama*,
   134 S. Ct. 1081 (2014) ............................................................. 13, 16

*Hurley v. United States,*
  10 Fed.Appx. 257 (6th Cir. 2001) .................................................................. 20

*Knowles v. Mirzayance,*
  556 U.S. 111 (2009) ............................................................................................ 13

*Lewis v. Mazurkiewicz,*
  915 F.2d 106 (3d Cir. 1990) .............................................................. 12, 15

*Lundgren v. Mitchell,*
  440 F.3d 754 (6th Cir. 2006) ........................................................................... 20

*Machibroda v. United States,*
  368 U.S. 487 (1962) ................................................................................... 11, 24

*Mayberry v. Petsock,*
  821 F.2d 179 (3d Cir. 1987) ............................................................................ 15

*Palmer v. Hendricks,*
  592 F.3d 386 (3d Cir. 2010) ...................................................................... 11, 24

*Premo v. Moore,*
  131 S. Ct. 733 (2011) .......................................................................................... 13

*Smith v. Robbins,*
  528 U.S. 259 (2000) ............................................................................................... 9

*Solis v. United States,*
  252 F.3d 289 (3d Cir.2001) .............................................................................. 25

*Strickland v. Washington,*
  466 U.S. 668 (1984) ................................................................................. *passim*

*United States v. Aiello,*
  814 F.2d 109 (2d Cir. 1987) ....................................................................... 11, 24

*United States v. Essig,*
  10 F.3d 968 (3d Cir.1993) ................................................................................. 25

*United States v. Fulton,*
  837 F.3d 281 (3d Cir. 2016) .................................................................... *passim*

*United States v. Gray,*
  878 F.2d 702 (3d Cir.1989) ...................................................................... 10, 27

*United States v. Lilly,*
  536 F.3d 190 (3d Cir. 2008) ............................................................................. 23

*United States v. Williams,*
   166 F. Supp. 2d 286 (E.D. Pa. 2001) ............................................................ 14

*Virgin Islands v. Weathermax,*
   77 F.3d 1425 (3d Cir. 1996) .............................................................. 13, 14

*Wiggins v. Smith,*
   539 U.S. 510 (2003) ............................................................................ 12

*Yarborough v. Gentry,*
   540 U.S. 1 (2003) .............................................................................. 12

## **Statutes**

18 U.S.C. § 924(c)(1)(A)(ii) .............................................................. 6

18 U.S.C. § 2113(a) ........................................................................ 6

18 U.S.C. § 3553(a) ........................................................................ 8

28 U.S.C. § 2255 ....................................................................... *passim*

## **Rules**

Fed. R. Crim. P. 49.1 ...................................................................... 3

## INTRODUCTION

Petitioner Rahman Fulton ("Fulton") was a sanitation worker in Morris County who was behind on his rent payments and owed his girlfriend money. On May 25, 2012, he robbed a bank at gunpoint and stole approximately $1,700. Over the course of an eight-day jury trial in 2014, defense counsel Carol Gillen and K. Anthony Thomas ("defense counsel") aggressively challenged the Government's case and presented testimony from a defense expert, a defense investigator and alibi witnesses. Fulton was ultimately convicted of one count of bank robbery and one count of using a firearm in furtherance of a crime of violence. This Court sentenced Fulton to 141 months' imprisonment. A panel of the Third Circuit affirmed Fulton's conviction.

Fulton now contends that he received constitutionally ineffective assistance from his defense counsel before and during trial. Fulton states the following grounds in his motion:

> Ground One:    "Failure to Prepare and Present an appropriate misidentification defense from evidence in defense counsel possession pre-trial"
>
> Ground Two:    "Failure to provide a defendant-requested 'Photogrammetry Expert' and data prejudiced the defendant...."
>
> Ground Three:  "Failure to correctly impeach Government witnesses at trial on evidence in their possession which created prejudice against Defendant."
>
> Ground Four:   "Failure to Investigate and Develop a proper alibi for defense."
>
> Ground Five:   "Failure to locate or interview Defense witnesses who could have supported a potentially effective defense...at trial."

All of Fulton's claims fail both the deficient performance prong and the prejudice prong of the stringent standard governing ineffective assistance of counsel claims. Because he cannot meet the high burden under 28 U.S.C. § 2255 and because his factual allegations are not specific and particularized, this Court should deny Fulton's motion without a hearing.

### STATEMENT OF FACTS

## A.    Factual History

Although he was employed as a sanitation worker for the Morris County Municipal Utilities Authority, A524-25, Fulton was behind on his rent payments, A178, and owed his girlfriend money, A606.[1] Despite obviously needing the money, on May 25, 2012, Fulton falsely claimed to be sick and did not go to work, A526-29, 536, 592-93, spent the morning playing video games with a teenager, A937-40, and failed to provide a doctor's note to his employer, A527—thereby forfeiting his holiday pay for the upcoming Memorial Day holiday, A527-29. Fulton, however, had decided on another source of funds.

May 25 had been a "normal working day" at the PNC Bank in Randolph,

---

[1] "A" refers to Defendant's Appendix on appeal. "SA" refers to the Supplemental Appendix supplied by the United States on appeal. "DB" refers to Defendant's Brief. "Exs. 531-37" refers to trial exhibits 531-37 (which were submitted in CD form by Defendant on appeal). "PSR" refers to the Pre-Sentence Report filed under seal with this Court. "StR" refers to the Statement of Reasons filed under seal with this Court. "Fulton Motion" and "Fulton Brief" refer to Fulton's 2255 motion and accompanying brief (Docket Entry 1 in this case). References to the criminal docket in *United States v. Rahman Fulton*, Cr. 13-261 are preceded by "#". For the Court's and the Defendant's convenience, the Government will submit courtesy copies of this brief as well as the Defendant's Appendix on appeal and the Supplemental Appendix on appeal.

New Jersey, and that afternoon the four employees were discussing the upcoming holiday weekend. A51-52, 74, 77, 957. At 4:08 p.m., however, everything changed. A98. At that time, the front doors of the bank "slam[med]" open, and the employees were "greeted" by Fulton, A78-79, who "rushed in through the front door," A957, covered "head-to-toe" in multiple layers of "bulky" clothing, A67; *see* A54-55, 78, 80-81, 823, 959, 1219-23. Carrying a gun, which he "cocked" and "point[ed]" at the bank employees, A74; *see* A55, 81, 83, 825-29, 1219-22, 1227, Fulton ordered them to the ground and "demanded that the tellers give him $10,000," A74-75; *see* A52, 957. After two employees gave Fulton money, A53, 59, 957-58, and having spent just 45 seconds inside, A97, Fulton declared that he was "outta here" and he ordered the employees not to "hit the alarms," A54; *see* A94-98. Fulton left with $1777. A101-02.

Unbeknownst to Fulton, his spoils included something else—a GPS tracking device hidden inside a bundle of cash. A53-54; *see* A91-92, 113-32, 246-50. That device tracked Fulton's short escape, from the PNC Bank to Victory Gardens, New Jersey, A134-48, 253-316; Exs. 531-37, where, at approximately 4:15 p.m., it repeatedly reported its location at Fulton's residence,[2] in an area consistent with his bedroom, A293-300, 316; *see* A171-73, 775-76, 942, 1226; Ex. 534.  At 4:18 p.m., the GPS device suffered a "high impact" shock, A309; *see* A268, 306-14, after which it reported from an

---

[2] Throughout this brief, in order to avoid using the residence's street address, in violation of Fed. R. Crim. P. 49.1, the Government will refer to the residence as "Fulton's" or "Calcaterra's."

adjoining backyard, where three of the four pieces of the broken device were later recovered, A268, 301-04, 453-71, 503-11, 866; Ex. 537.

Just one minute later, at 4:19 p.m., Fulton—in a departure from past practice—called his girlfriend's sister, Karina Echevarria, who worked at a Kmart store in the same shopping center as the PNC Bank. A564-78. Fulton asked Echevarria "whether or not there was something going on outside the Kmart," A578, which was the first time that Echevarria had heard that something "unusual was going on that afternoon," A575. Echevarria went outside, checked, and called Fulton back at 4:24 p.m., relaying that "something happened at the PNC Bank." A578-80. Fulton responded that "there were policemen everywhere looking for the person who robbed the bank." A580-81.

While the GPS device had notified local law enforcement officers about the bank robbery, *e.g.*, A499, 614-16, 762, it took several minutes for them to respond to Victory Gardens, *e.g.*, A425. Law enforcement officers drove through the neighborhood at approximately 4:18 p.m., A429-33, before setting up a perimeter in the area where the GPS device was reporting, A359, 404, 434-35, 618-19.

After their arrival in what was a "chaotic" situation, A433, 764, officers began investigating several leads, including video cameras mounted to a house and the backyard from which the GPS device was reporting, A381-89, 411-13, 453-71, 503-11.   At that time, however, the officers did not mention the bank robbery to those in the neighborhood. A188-91. At approximately 5:00 p.m., officers first began canvassing the neighborhood, walking from door-to-door.

A471-80, 514-17, 521. They initially saw no one matching the description they received of the robber, A473, 479-80, 517—"a large black male wearing dark clothing or black clothing armed with a handgun" and weighing approximately 210 pounds, A401, 476-77; *see* A431, 509, 620; *see also* A55, 80-81, 959. Among those interviewed was Michael Calcaterra, who rented a room to Fulton but had not seen him that day and therefore told officers that no one (besides him and his son) was at his house. A168, 179, 188-89, 475-77; *see* A783.

Later that evening, however, officers received reports that a man matching the description of the robber was seen at Calcaterra's residence. A481, 620. After 6:00 p.m., Lieutenant Stephen Wilson went to that house, where he interviewed Fulton, A620, who had previously been peering through the house's windows, A951, 954. Fulton told Wilson that he had been at work that day and had returned home around 4:00 p.m., at which time he was with his girlfriend, Rosalyn Torres. In support of that alibi, Fulton pointed to the woman seated next to him, who did not speak English and was, in fact, Calcaterra's girlfriend, not his. A621-24; *see* A591-94, 781.

In the days following the robbery, law enforcement officers investigated various leads. *E.g.*, A765-68, 830. For example, they learned that another large black male, Ricardo Barnes, lived in the residence adjoining Fulton's. A784-85, 791. Officers, however, decided that Barnes was not a suspect, because: at over 300 pounds, he was "way bigger than the bank robber," A784-87, 789, 814, 836-38; and Barnes' cell phone records corroborated his story that he did not rob the bank and had traveled widely that day, showed that he received a call

5

at the time of the robbery, and showed that he was not at the PNC Bank during the robbery, A839-47, 923-27; *see* A358-59, 658-64, 728-33. Indeed, records showed that at 4:08 p.m., Barnes' cell phone was at the very least 1000 feet away from the PNC Bank. A730-31.

On July 5, 2012, officers executed a search warrant at Fulton's residence and interviewed him. A777-80. Fulton admitted that he lied about being at work on the day of the bank robbery, and he claimed that he first learned about the robbery from his neighbor, who had seen it on the news. A778-80. Although nothing was found during the search, A778, Fulton told Torres afterwards that he was concerned that officers had discovered a piece of the broken GPS in the attic, A597-99; *see* A866, which could only be accessed from stairs in Fulton's bedroom, A175-76, 600. Although Torres was "upset" and "scared" by Fulton's admission, A598-600, she later asked Calcaterra to write a statement in support of him, A222-23. While incarcerated and awaiting trial, Fulton was recorded telling a friend that he was trying to avoid working out "because I ain't wanna get too big again." A1053-54.

**B.   Procedural History**

Fulton was arrested on December 14, 2012, A13, and ultimately charged with: one count of bank robbery, in violation of 18 U.S.C. § 2113(a); and one count of brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). A14, # 16.

### 1.    The Trial

An eight-day jury trial began before the Hon. Stanley R. Chesler,

U.S.D.J., on January 14, 2014. During the Government's case, the jury heard

the testimony of: Robin Hunt and Carol Viola, both of whom were PNC Bank

employees who witnessed the bank robbery; Ed Farrington, a security analyst

for PNC Bank; Jennifer Walsh and Dr. Richard Fuller, both of whom discussed

the GPS tracking device, the latter as an expert in GPS technology; Victory

Gardens residents Michael Calcaterra and Frank Childs; Ricardo Barnes and

his mother Monica; Frederick Wilson and Helen O'Keefe, who worked for the

Morris County Municipal Utilities Authorities; Karina Echevarria, who testified

about her phone conversations with Fulton following the robbery; Fulton's

girlfriend, Rosalyn Torres; Special Agent William Shute, who testified as an

expert in historical cell site analysis; Lieutenant Wilson, who testified about his

conversation with Fulton on the day of the robbery; Lieutenant Jeffrey Gomez

and Special Agent James Scartozzi, who testified about their investigation of

this case; and numerous other law enforcement officers who responded to

Victory Gardens.   The jury also viewed security video footage of the robbery

and animation showing the track of the GPS following the robbery. During the

trial, defense counsel objected to evidence and expressed disagreement with

many of the Government's arguments. *E.g.*, A215, 216, 220, 221, 520, 816,

817, 823, 848, 857, 1035, 1039-46, 1136-37, 1159-60.

During Fulton's case, the jury heard the testimony of: Victory Gardens

residents Anthony Calcaterra and Keith Munro; PNC Bank teller Cynthia

Womack; Defense Investigator Nicole Dreyer; and Robert Beegle, who testified as an expert in cell phone call detail analysis. Fulton's theory of defense, which he pursued relentlessly, was that Ricardo Barnes robbed the bank. According to Fulton's defense, the pictures and video of the robber matched Barnes, not Fulton, and law enforcement officers put on "blinders" when they focused on Fulton to the exclusion of Barnes. A1124-45; *e.g.*, A39-41, 208-10, 610, 635-38, 640-41, 665-94, 735-41, 789-813, 887-918, 928, 936-45, 990-1001, 1021-33.

On January 28, 2014, following a short period of deliberations, SA28; A19,# 65, the jury returned guilty verdicts as to both counts of the Indictment, A1214-16; *see* A20, # 67.  A sentencing hearing was held on December 22, 2014, during which the District Court "compliment[ed]" trial counsel, noting that they had "done an extraordinary job" in this "vigorously and hotly contested case." *See* SA1-34. After considering the arguments of the parties and the 18 U.S.C. § 3553(a) factors, the District Court imposed a within-Guidelines sentence of 141 months' imprisonment. A4; SA27-31; StR.

## 2.    The Appeal

On Appeal, Fulton argued that government witnesses offered improper opinion testimony regarding Ricardo Barnes' phone usage on the day of the robbery, that government witnesses offered improper opinion testimony that Fulton matched and Barnes did not match the person seen on the surveillance video, and that the government's closing argument mischaracterized the expert testimony regarding the location of the GPS device.

The Third Circuit affirmed the conviction, holding that the government's closing did not mischaracterize the expert testimony and that the government witnesses gave proper lay opinion testimony regarding the height of the suspect shown on the surveillance video. The Court also characterized certain testimony by government witnesses regarding phone usage during the day of the robbery and the appearance of Fulton and Barnes as compared to surveillance photos as improper lay opinion, but held their admission did not amount to plain error. *See United States v. Fulton*, 837 F.3d 281 (3d Cir. 2016).

### ARGUMENT

Fulton bears the burden of establishing counsels' ineffectiveness under *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). To meet that burden, Fulton must make two distinct showings: (1) deficient performance and (2) prejudice. *See Strickland*, 466 U.S. at 687.

The deficient performance prong requires a showing that defense counsel's conduct fell below an "objective standard of reasonableness" with evidence overcoming the "strong presumption" that counsel's strategy and tactics fell "within the wide range of reasonable professional assistance." *Id.* at 688−89; *accord Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). Trial counsel's "strategic choices . . . are virtually unchallengeable," *Strickland*, 466 U.S. at 690, and "reviewing counsel's performance, the court must be highly deferential," *United States v. Lore*, 26 F. Supp. 2d 729, 738 (D.N.J. 1998) Rodriguez, J.) (citing *Strickland*, 466 U.S. at 689).

The prejudice prong, in turn, requires a showing that counsel's deficient performance "prejudiced the defense" with proof of a "reasonable probability" that, but for counsel's unprofessional errors, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome" of the case. *Id.* at 694. In other words, counsel's deficiency must lead to the "result of the proceeding [being] fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Moreover, nothing prevents a court from analyzing whether the movant has proven prejudice, and after concluding that the petitioner has not, denying the petitioner's claim without ever analyzing counsel's performance. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed"); *Smith v. Robbins*, 528 U.S. 259, 286, n.14 (2000.)

### A. Defense Counsel Was Not Ineffective with Respect to their Witness Selections at Trial

Fulton contends that defense counsel should have called a witness that he claims would have testified that Barnes told them on the day of the bank robbery that he "had just got his hand on some cash and wanted to meet up, but was unable to retrieve his car due to his street being blocked off by police." Fulton Brief at 33.[3] Fulton does not provide the name of this witness, fails to

---

[3] In Exhibit 1, Fulton provides similar information, "Around 4:19:53 PM Barnes receive[d] a call from a witness not called for trial; and had she testified, she would have testified that Barnes told her that 'he had gotten his hands on some cash and wanted to meet her, but [his] street and neighborhood was blocked off by Police and would need to meet here [sic] later in the day in the Irvington – Orange Area." Fulton Brief, Exhibit 1 at 8. Fulton also provides this slightly different description, "told a

provide an affidavit or any competent evidence of what the witness's testimony would have been at trial, or even indicate what the source is for the alleged quotation he puts into his brief. Fulton Brief at 33. Fulton goes on to say that defense counsel informed him "that the witness would not cooperate with the defense." *Id.*

Because Fulton fails to establish by competent evidence what this unnamed witness would have said his claim must fail. The Third Circuit has "repeatedly emphasized that 'bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing' on a habeas petition." *Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010) (citations omitted). *See Duncan v. Morton*, 256 F.3d 189, 201–02 (3d Cir. 2001) (refusing prisoner's invitation "to speculate both as to whether Sherman would in fact have testified on his behalf and as to what Sherman's testimony would have been."); *Forbes*, 2014 WL 799002, at *5 ("Bell's refusal to provide an affidavit in support of Forbes's motion for discovery and to even speak with Forbes's attorneys makes it clear that Forbes's contention as to the testimony that Bell would give is based on speculation and that all Forbes has provided the court is mere conclusory allegations asserted by counsel which the court does not accept as facts"); *United States v. Aiello*, 814 F.2d 109, 113–14 (2d Cir. 1987) (a § 2255 "application must contain assertions of fact that a petitioner is in a position to

---

witness during this 4:18:53 call that he was in the area of his Mother's house at the time of the robbery – but was tied up and unable to retrieve his car at that time due to his street being blocked of [sic] by police." Fulton Brief, Exhibit 1 at 8. Fulton provides no source for these alleged quotations.

establish by competent evidence," such that "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing") (citing *Machibroda v. United States*, 368 U.S. 487, 495-96 (1962); *Dalli v. United States*, 491 F.2d 758, 761 (2d Cir 1974)); *Barry v. United States*, 528 F.2d 1094, 1101 (7th Cir. 1976) ("the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner has actual proof of the allegations going beyond mere unsupported assertions") (footnotes omitted).

Further, defense counsel is not required to put on an uncooperative witness. "An attorney can avoid activities that appear 'distractive from more important duties.'" *Harrington v. Richter*, 131 S. Ct. 770, 789 (2011) (quoting *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam)). Defense counsel here was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 131 S. Ct. at 789. "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Id.* at 789–90.

Thus, defense counsel "was not bound by an inflexible constitutional command to interview every possible witness." *Lewis v. Mazurkiewicz*, 915 F.2d 106, 113 (3d Cir. 1990). Instead, they were "simply required to exercise reasonable professional judgment in deciding whether to interview." *Id.* Further, "courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions.'"

*Richter*, 131 S. Ct. at 790 (quoting *Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003)). But "neither may they insist counsel confirm every aspect of the strategic basis for his or her actions," given the "'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Richter*, 131 S. Ct. at 790 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Moore*, 131 S. Ct. at 740 (quoting *Strickland*, 466 U.S. at 690). Here, Fulton admits that defense counsel explained that the unnamed witness would not cooperate with the defense.

Witness selection is entrusted to defense counsel's sound judgment, not to the defendant. *See Virgin Islands v. Weathermax*, 77 F.3d 1425, 1434 (3d Cir. 1996) (citing cases). In reviewing that exercise of judgment, this Court must not only give defense counsel "the benefit of the doubt" but also "affirmatively entertain the range of possible reasons" that they "may have had for proceeding as [they] did." *Pinholster*, 131 S. Ct. at 1407 (quotation marks omitted). That is because "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Richter*, 131 S. Ct. at 791. Here, no one could say that it was objectively unreasonable for defense counsel to have decided that calling a witness that would not cooperate with the defense would do more harm than good. *Cf. Mirzayance*, 556 U.S. at 125 ("Competence does not require an attorney to

13

browbeat a reluctant witness into testifying, especially when the facts suggest that no amount of persuasion would have succeeded.").

Fulton similarly faults defense counsel for "[n]ot interviewing key witnesses that easily would have proven Fulton could not have committed the crime," but fails to explain how these individuals would have proven that he did not commit the crime. Fulton Brief at 14. Fulton refers to "at least two (2) individuals . . . that could have bolstered the Petitioner's alibi defense" but does not say in his brief who these individuals were or what their testimony would have been or how the testimony would have been significantly different from the cross examination of Michael Calcaterra or the testimony of the alibi witnesses his defense team did call: Anthony Calcaterra and Keith Munro. *Id.* at 33.

In Exhibit F to his brief, Fulton suggests that Irma Fernandez would have been one of these witnesses: "Irma was home all day with Fulton, but no-one called her as a witness . . . She would have been the second eyewitness." Fulton Brief, Exhibit F at 41. Fulton does not describe or offer any competent evidence of what Irma Fernandez's trial testimony would have been. For this reason alone, his claim must fail. It also must fail because defense counsel chose to pursue a defense strategy that involved putting up several alibi witnesses and witness selection is entrusted to defense counsel's sound judgment, not to the defendant. *See Weathermax*, 77 F.3d at 1434 (3d Cir. 1996) (citing cases); *United States v. Williams*, 166 F. Supp. 2d 286, 306-07 (E.D. Pa. 2001) (denying ineffective assistance of counsel claim where

defendant made no showing as to what type of evidence would have been revealed with more investigation as "[b]ald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing in habeas corpus matters.") (quoting *Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987)); *see also Lewis v. Mazurkiewcz*, 915 F.2d 106, 115 (3d Cir. 1990) ("With respect to trial counsel's decision not to interview Miller, petitioner has failed to show a reasonable likelihood that such an interview would have produced any useful information not already known to trial counsel[.]")

Fulton also faults his counsel because he claims that no one contacted Nicola Gibbs to verify Barnes's claim that he was out shopping with her. Fulton Brief at 21. Fulton fails to establish that this claimed conduct fell below "prevailing professional norms," fails to set forth any alleged prejudice for this claim, and sets forth no competent evidence of what his requested investigation would have shown and how it would have altered the course of the trial. *Strickland* 466 U.S. at 687. For these reasons, this claim must fail.

Fulton claims that had the defense contacted Barnes's prior employers they would have established they had used GPS tracking devices. Fulton Brief at 21-22. Fulton again fails to set forth any competent evidence of what his requested investigation would have shown. He also can show no prejudice or that this conduct constitutes ineffective assistance of counsel where he admits that his counsel obtained a stipulation that stated that Barnes's prior employer was in fact a customer of 3SI, a company that provides GPS tracking devices. Fulton Brief at 22. For these reasons, this claim must fail.

15

Fulton claims his defense counsel should have called a photogrammetry expert to compare the head size of the bank robber—who was wearing several masks—to pictures of an unmasked Fulton to testify that Fulton's head was smaller than the multiple-masked bank robber. Fulton Brief at 17. However "selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam) (quoting *Strickland*, 466 U.S. at 690). Further, the argument that Fulton did not match the surveillance images was advanced by defense counsel and was described by the Third Circuit as follows:

> At trial, Fulton asked Michael Calcaterra (Fulton's roommate) and Rosalyn Torres (Fulton's girlfriend at the time of the robbery) to review the surveillance images and opine on whether they depicted him. Both of those witnesses were intimately familiar with Fulton's appearance. . . Calcaterra testified Futon had a different appearance from that of the robber in the surveillance footage. Michael Calcaterra explained that the robber appeared to be "chunkier," Fulton was a "little more defined," and Fulton's head was smaller. Torres testified similarly.

*Fulton*, 837 F.3d at 299.

 With respect to the surveillance images, the Government did not argue that they matched Fulton. In closing argument, the Government displayed the images to the jury and argued that they excluded Barnes, but did not exclude Fulton:

> Let's pull up Exhibit 181. The defense has suggested that the defendant somehow doesn't fit the description of the bank robber. And let's be clear, no one is suggesting that you can be absolutely certain from looking at these photographs and the photographs alone that this is the defendant. That would be ridiculous.

> The point is that the defendant is not ruled out by these photographs. Ricardo Barnes is ruled out because he's way too big, but the defendant is not ruled out.
>
> What do we know about what the bank robber was wearing? Multiple layers of clothing, including a sweater that is obviously too large. Look at the neckline. Multiple layers of head gear. . . here you can see the defendant adjusting his mask because his masks have become misaligned.

A1151. Thus, it was not ineffective assistance of counsel for defense counsel to not call yet another witness to testify about how the surveillance photos do not resemble Fulton. Nor does Fulton proffer competent evidence to show that his expert would have been able to provide admissible expert testimony that the head depicted in the surveillance video, which was covered by several masks, was not Fulton's. Fulton also fails to establish prejudice, particularly where his defense team offered testimony from two witnesses that said what the surveillance photos were not Fulton.

## B.     Fulton Cannot Relitigate the Trial under the Guise of an Ineffective Assistance Claim

At base, Fulton faults his defense counsel for not succeeding in persuading the jury that Ricardo Barnes robbed the bank instead of him. This is not a cognizable claim under 28 U.S.C. § 2255. According to defense counsel during trial, the pictures and video of the robber matched Barnes, not Fulton, and law enforcement officers put on "blinders" when they focused on Fulton to the exclusion of Barnes. A1124-45; *e.g.*, A39-41, 208-10, 610, 635-38, 640-41, 665-94, 735-41, 789-813, 887-918, 928, 936-45, 990-1001, 1021-33. This theory of defense was pursued relentlessly throughout the trial and at several stages of the trial, defense counsel scored points as it pursued

this strategy. As the District Court pointed out:

> THE COURT: . . . from the semi-astonished look on the government attorneys' faces, it appears that if this is Giglio, they are not fully aware or, indeed, are not aware of the existence of this Giglio.
>
> * * *
>
> THE COURT: No. You obviously have better information than the government had about what he was doing – all right – and you were permitted to inquire into his [Barnes's] Costco bad check . . . I think you did it very effectively, all right, and the only problem was he 'fessed up very quickly.

A555 & A972.

The Third Circuit also highlighted defense counsel's vigorous and effective attacks on the government witnesses:

> [O]n cross-examination, defense counsel elicited a critical admission from Scartozzi: the call in question might have gone to voicemail. Defense counsel also called its own investigator, Nicole Dreyer, who testified that the 4:08:44 p.m. phone call *did* go to voicemail. Thus, the jury clearly understood that the mere fact that Barnes *received* a call at 4:08:44 p.m. did not mean he *took* the call at that time. Dreyer's testimony was consistent with common sense.
>
> * * *
>
> [D]efense counsel was able to solicit a concession from Scartozzi that the call in question could have gone to voicemail. This admission helped establish that Barnes was not necessarily on the phone at the time of the robbery. It exposed Scartozzi's statement as a mere opinion, and an incorrect one at that. More importantly, Fulton's investigator testified that the call in question did actually go to voicemail. Therefore, Fulton presented persuasive evidence that Barnes was not, in fact, on the phone at the time of the robbery. At the very least, defense counsel showed that Barnes should not have been excluded as a suspect merely because he received a call at 4:08 p.m.

*Fulton*, 837 F.3d at 290 & 294.

Notwithstanding defense counsel's trial strategy, Fulton still faults

18

defense counsel for

> [f]ailing to fully investigate thoroughly Barnes's criminal history,
> his motive, his so-called alibi, his need for cash, his ability, his
> availability, assessability [sic] etc . . . . knowing full well, that even
> on the day Barnes was to testify against Fulton, Barnes was a
> awaiting arrest for opening (5) five different fraudulent Costco
> accounts; then illegally running those fake accounts up to
> $14,000.00.

Fulton Brief at 14. Fulton refers to this as a "Giglio" violation and cites to A548,

A551, and A555. Fulton also faults defense counsel for not being allowed to

present Barnes's pending arrest for "fraudulent acts at Costco at the time of his

trial testimony," his "5 outstanding warrants (active) traffic violations," (A552)

"multiple bad checks in violation of 2C:21-5," "crime of disorderly persons, 3rd

Degree on passing another bad check for $1,756.66," (A932-3) "Barnes pled

guilty to leaving the scene of a crime," and Barnes's social security number was

used or registered to multiple individuals with lengthy criminal background

history that was never resolved by the defense" (A643). Fulton Brief at 23.

    With respect to the fraudulent acts at Costco, defense counsel

repeatedly argued that they be permitted to inquire and the Court ruled

against them. A647. The Court ruled that defense counsel could inquire about

"the $1737 Costco check" and on cross-examination defense counsel got

Barnes to admit he wrote a bad check to Costco. A701 & 704. None of these

complaints come close to overcoming the "strong presumption that counsel's

conduct falls within the wide range of reasonable professional

assistance." *Strickland*, 466 U.S. at 698.

    Much of Fulton's brief is focused on arguing the underlying facts that

came into the record at trial. Those facts were put before the jury and were addressed again on Fulton's direct appeal. This is not the forum to try his case again. *See Gov't of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1074–75 (3d Cir.1985) (citations omitted) ("A section 2255 petition is not a substitute for an appeal . . . nor may it be used to relitigate matters decided adversely on appeal . . . .").

Fulton's complaints about the manner in which defense counsel implemented their trial strategy cannot succeed here. "[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134 (1982). Failure to make a particular objection does not usually constitute ineffectiveness, because objections necessarily fall within trial strategy. A failure to object is not ineffective assistance unless the evidence is so prejudicial that it "essentially defaults the case to the state." *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006).

## C.     Defense Counsel Was Not Ineffective For Any of the Other Stated Grounds

Fulton also faults defense counsel on a variety of other topics, including attempting to move a document into evidence that was already in evidence (A897), for attempting to impeach a law enforcement witness with the report of another law enforcement witness (A419), for going beyond the scope of direct during the cross examination of Michael Calcaterra (A228), for failing to admit expert testimony showing that Barnes's cellphone was in the bank parking lot

which their own expert disclosure and the underlying data said was not proper (A752, A969-971), for requesting unredacted version of police reports (A483), for deciding not to call all of the witnesses on their witness list (A968), and for failing to present a timeline similar to the one presented in his brief. None of these constitute ineffective assistance of counsel and Fulton has not established prejudice from any of these actions.

Fulton also faults his defense counsel for not attacking the testimony of Dr. Fuller (Fulton Brief at 15-17), but that claim is contradicted by the record, does not constitute ineffective assistance, and Fulton has not established prejudice. A319-342. Defense counsel questioned Dr. Fuller on several topics, attacking the accuracy of his error ellipses using a large tape measure in a courtroom demonstration (A320-327), his prior testimony for the government (A331), elicited facts to support the Ricardo Barnes theme, namely that the data could be consistent with someone driving a vehicle to the house adjoin Fulton's residence and reversing into its driveway (A333), Dr. Fuller's initial understanding that the structure where Fulton's residence was located was one building and that he later understood it to be two adjoined dwellings (A335), that Dr. Fuller was very proud of the tracking device he helped design (A339-340), and used testimony from prior testimony in another trial to attack Dr. Fuller's testimony that the tracking device functions better when mobile (A340-341). None of this constitutes ineffective assistance of counsel, and counsel's decisions about whether and to what extent to conduct cross-examination are

necessarily strategic and thus "effectively insulated" from ineffectiveness review. *See Hurley v. United States*, 10 Fed.Appx. 257, 260 (6th Cir. 2001).

Fulton also faults his defense counsel for not making efforts to change the grand jury testimony of Rosalyn Torres and Karrina Echevarria which inculpated the defendant. Fulton Brief at 34. This too does not constitute ineffective assistance of counsel and Fulton has not shown prejudice. But furthermore, Fulton's factual suggestion that the testimony would have changed in some way if these witnesses knew they could change their testimony is contradicted by the record:

> Q:    Miss Echevarria, a moment ago you said that you did not know that you could correct or change your testimony. Correct?
>
> A.    Yes.
>
> Q.    Isn't it true that you were told that during your grand jury testimony?
>
> A.    I don't remember.
>
> Q.    Please turn to page J-1122, and read lines 22 to the next page, J-1123, line five, and let me know when you're done reading it to yourself. Are you done reading to yourself?
>
> A.    Uh-huh.
>
> Q.    Did that refresh your recollection about whether or not you were told that you could correct or change your testimony?
>
> A.    Yes.
>
> Q.    You were told that --
>
> A.    Yes.
>
> Q.    -- weren't you? I told you that, didn't I?

A.      Yes.

Q.      But you never did contact anyone to change or correct your testimony. Correct?

A.      Yes.

A575-576. With respect to Ms. Torres the record is similar:

Q.      Miss Torres, when you testified before the grand jury and you were told that after you left the grand jury, if you decided that anything that you said was incorrect, incomplete or untrue in any way, or if you want to make additions or changes to your testimony, you may have the opportunity to do so, and told that you should contact the U.S. Attorney's Office immediately if you wanted to make any such corrections and were asked if you had any questions about that. Right?

A.      Correct.

Q.      And you said you didn't have any questions about that.

A.      No.

A611. For these reasons, Fulton's other grounds do not establish ineffective assistance of counsel.

**D.      No Evidentiary Hearing is Necessary**

In resolving Fulton's ineffective assistance of counsel claims, this Court is "required to hold an evidentiary hearing unless the motion and files and records of the case show conclusively that the movant is not entitled to relief." *United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008) (quotation marks and internal quotation marks omitted). If the petitioner fails to sufficiently lay out the appropriate allegations or fails to show prejudice, an evidentiary hearing is not necessary. *See Duncan v. Morton*, 256 F.3d 189, 201–02 (3d Cir. 2001)

(refusing prisoner's invitation "to speculate both as to whether Sherman would in fact have testified on his behalf and as to what Sherman's testimony would have been."); *Forbes*, 2014 WL 799002, at *5 ("Bell's refusal to provide an affidavit in support of Forbes's motion for discovery and to even speak with Forbes's attorneys makes it clear that Forbes's contention as to the testimony that Bell would give is based on speculation and that all Forbes has provided the court is mere conclusory allegations asserted by counsel which the court does not accept as facts"); *United States v. Aiello*, 814 F.2d 109, 113–14 (2d Cir. 1987) (a § 2255 "application must contain assertions of fact that a petitioner is in a position to establish by competent evidence," such that "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing") (citing *Machibroda v. United States*, 368 U.S. 487, 495-96 (1962)); *Dalli v. United States*, 491 F.2d 758, 761 (2d Cir 1974)); *Barry v. United States*, 528 F.2d 1094, 1101 (7th Cir. 1976) ("the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner has actual proof of the allegations going beyond mere unsupported assertions") (footnotes omitted).

In addition to failing to allege facts constituting a sufficient ground for an evidentiary hearing through the submission of affidavits or other competent evidence, Fulton "has failed to establish that" counsel "prejudiced him in a way that 'undermine[s] confidence in the outcome.'" As such, this Court will "not abuse its discretion in declining to hold an evidentiary hearing before denying" Fulton's claim. *Id.* at 197 (quoting *Strickland*, 466 U.S. at 694). Indeed, "a court

24

should be reluctant to convene an evidentiary hearing to explore the claims of a petitioner whose pleadings are factually insufficient to suggest any entitlement to habeas relief." *Palmer v. Hendricks*, 592 F.3d 386 (3d Cir. 2010).

Since the underlying record unambiguously establishes that Petitioner is not entitled to relief, no evidentiary hearing is warranted. *See Gov't of V.I. v. Forte,* 865 F.2d 59, 62 (3d Cir.1989); see also *Solis v. United States,* 252 F.3d 289, 295 (3d Cir.2001) ("a defendant [is] not entitled to a hearing if his allegations [are] contradicted conclusively by the record, or if the allegations [are] patently frivolous"); *accord Brown v. United States,* 45 F. App'x 92, 95 (3d Cir.2002) ("if [the claim] is nonfrivolous [but] fails to demonstrate either deficiency of counsel's performance or prejudice to the defendant, then [the claim] does not merit a hearing").

Even if Fulton had properly alleged facts with competent evidence, any allegation of prejudice must be weighed against the trial evidence, which included evidence that:

- Fulton was behind on his rent payments and owed his girlfriend money, A178, 606;

- Fulton called in sick on the day of the bank robbery, even though he was not sick, and never tendered a sick note to his employer, thereby forfeiting his pay for the upcoming holiday, A526-29, 536, 592-93;

- Fulton was the same height and race as the bank robber, A55, 80-81, 220, 824;

- A GPS tracking device hidden in the money taken from the PNC Bank reported that it was within Fulton's residence for over a minute, before suffering a "high impact" shock and reporting from an adjoining backyard, where three of the four broken pieces were later discovered, A53-54, 91-92, 113-48,

25

171-73, 253-316, 453-71, 503-11, 775-76, 866, 1226; Ex. 534;

- As law enforcement was just arriving in his neighborhood, A425, 429-33, well before they were mentioning the bank robbery to residents, A188-91, 471-80, 514-17, 521, and immediately after the GPS device was destroyed, A309, Fulton called his girlfriend's sister to inquire about "whether or not there was something going on" near the PNC Bank, A564-78, and told her that "there were policemen everywhere looking for the person who robbed the bank," A578-81, a piece of evidence the Third Circuit called "particularly damning," *Fulton*, 837 F.3d at 301.

- Calcaterra did not see Fulton at home, A168, 179, 188-89, 475-77, 783, but Fulton was later seen peering through the house's windows, A951, 954;

- During his first interview, Fulton falsely claimed that he went to work that day and spent the afternoon with his girlfriend, at which point he motioned to Calcaterra's girlfriend, who did not speak English and therefore could not answer the officer's questions, A591-94, 621-24, 781;

- On the day his residence was searched, Fulton admitted that he lied about being at work, but then claimed, without mentioning his conversations with his girlfriend's sister, that he first learned about the robbery from his neighbor, who saw it on the news, A778-80;

- After his residence was searched, Fulton confided in his girlfriend that he was concerned that officers had discovered a piece of the broken GPS in the attic, A597-99, which could only be accessed from stairs in his bedroom, A175-76, 600; and

- During a conversation that was recorded as Fulton awaited trial, he conveyed his desire to stop working out, so that he would not "get too big again," A1053-54.

In addition to this strong evidence linking Fulton to the robbery, there

was also strong evidence exonerating Barnes. It included:

- Evidence that in the summer of 2012, Barnes weighed in excess of 300 pounds, A660-63, 785-89, 814, 836-37, 1230-

26

31;

- Testimony from Barnes' mother that he was not home that afternoon, and had not returned home before 4:45 p.m., when she left for work and the neighborhood had already been locked down, A358-61;

- Testimony from Barnes that he did not rob the bank and was traveling widely that day, A658-64, 673;

- Cell phone records corroborating Barnes' account, A844-47; and

- Cell phone records showing that at 4:08 p.m., the time of the bank robbery, Barnes' cell phone, which he was carrying, A363, 670, 692, was not at the PNC Bank and was at the very least 1000 feet away, A723-31, 735.

The Third Circuit noted that "Fulton's telephone call to Echevarria in which he acknowledged awareness of the bank robbery that had just occurred is particularly damning." *Id.*, at 301. The Court explained further as follows:

> Furthermore, the testimony regarding the location of the GPS indicated that it spent time in, above, or below Fulton's half of the house for significantly more time than it was in, below, or above Barnes' half. Most damning of all, Fulton called his girlfriend's sister and mentioned the robbery immediately after the GPS was smashed and before police had arrived in his neighborhood. This call was very strong circumstantial evidence of Fulton's guilt. This evidence would not have been sufficient, by itself, to prove Fulton's guilt beyond a reasonable doubt. But when considered together with all of the other evidence in this case, that phone call pointed a very strong finger of guilt directly at Fulton.

*Id.*, at 281.

Even if Fulton could somehow show that defense counsel's performance was constitutionally ineffective, which he cannot, he has not sufficiently alleged prejudice, and Fulton's allegations are too vague and conclusory to warrant a hearing.

## CONCLUSION

In sum, because "counsel is afforded a wide range within which to make decisions without fear of judicial second-guessing," it is "'only the rare claim of ineffectiveness of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance.'" *Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir. 1999) (quoting *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989)). Fulton's allegations here do not present one of those rare claims. Accordingly, this Court should deny his § 2255 motion without a hearing.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

s/ Daniel Shapiro

By:   DANIEL SHAPIRO
Assistant U.S. Attorney

Date: May 23, 2019

## **CERTIFICATE OF SERVICE**

I, Daniel Shapiro, an Assistant United States Attorney, hereby certify

that:

On May 23, 2019, I caused a copy of the attached Response To Motion To

Vacate, Set Aside Or Correct Sentence Pursuant To 28 U.S.C. § 2255 to be sent

to the following person:

Rahman Fulton (via regular mail)
64940-050
Federal Correctional Complex-Allenwood Low
P.O. Box 1000
White Deer, Pa 17887

I declare under penalty of perjury that the foregoing is true and correct.

s/Daniel Shapiro
DANIEL SHAPIRO
Assistant U.S. Attorney

Dated: Newark, New Jersey
        May 23, 2019

29