## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|                                   |   |                                    |
|-----------------------------------|---|------------------------------------|
| RAHMAN R. FULTON,                 | : |                                    |
|                                   | : | Civil Action No. 18-16526 (SRC)    |
| Petitioner,                       | : |                                    |
|                                   | : |                                    |
| v.                                | : | **OPINION**                        |
|                                   | : |                                    |
| UNITED STATES OF AMERICA,         | : |                                    |
|                                   | : |                                    |
| Respondent.                       | : |                                    |
|                                   | : |                                    |

**CHESLER**, District Judge:

Presently before the Court is Petitioner Rahman R. Fulton's motion to vacate his sentence brought pursuant to 28 U.S.C. § 2255. (ECF No. 1). Following an order to answer, the Government filed responses to the motion (ECF No. 6, 11), to which Petitioner replied in the form of a reply brief and motions for an evidentiary hearing, to expedite this matter, and for the entry of a "default" judgment. (ECF Nos. 7, 8, 9, 10). For the reasons set forth below, this Court will deny Petitioner's motion to vacate sentence, deny Petitioner's remaining motions, and deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction and sentence, the Court of Appeals for the Third Circuit summarized the factual background of this matter as follows:

> On May 25, 2012, a large man who appeared to be wearing multiple layers of clothing entered the PNC Bank in North Randolph, [New Jersey,] carrying a gun. He ordered everyone to the ground and demanded money from the tellers' second drawers. Two PNC employees quickly handed him two stacks of cash, one of which contained a concealed Global Positioning System tracking device. The robber's face was completely covered by a ski mask. The

robber's height was estimated as being anywhere from 6 feet to 6 foot 3 inches. One employee described him as having a "medium build" and being "solid," but admitted she "couldn't really totally tell [if he was] muscular or not because [of] the way [he] was covered." She estimated his weight at 220 to 230 pounds. Another employee described him as "a husky man, built" and "not necessarily fat but, you know, muscular." She said it was hard to tell his build because of his bulky clothing. The robbery occurred at 4:08 p.m., and lasted a matter of minutes. The GPS device hidden inside the stack of bills activated as soon as it was removed from the teller's drawer. After the robber fled, the GPS device quickly led law enforcement officers to the neighboring town of Victory Gardens. Within minutes, dozens of police officers swarmed the area. The signals from the GPS then directed police to a building at 1 Jane Avenue. When police arrived at that location, they discovered fragments of the GPS in the backyard. Based on the GPS data, the government's GPS expert testified at trial that the GPS was "disrupted" – likely smashed – between 4:18:37 and 4:18:53 p.m. Police did not recover any fingerprints of evidentiary value on the fragments.

Subsequent analysis of the GPS data led law enforcement to two suspects: [Petitioner] and Ricardo Barnes. The GPS had signaled its location at 2-6 John Avenue immediately before it had been destroyed. [Petitioner] and Barnes lived in opposite halves of a house located at that address. Two John Avenue was owned by Michael Calcaterra, who rented a room to [Petitioner], while the 6 John half belonged to Barnes' mother, with whom Barnes lived. [The opinion thereafter contained a diagram of the building showing two connected residences with a backyard that bordered the yard in which the smashed GPS had been discovered.]

. . . .

At the time of the robbery, [Petitioner] was employed as a sanitation worker for the Morris County Municipal Utilities Authority. Despite this source of income, he was slightly behind on his rent payments and owed his girlfriend some money.

Officers first spoke to Fulton on the day of the robbery as they canvassed the Jane and John Avenue area after locating the GPS. By then, Officer Edelman had heard a report that someone fitting the description of the perpetrator lived at 2 John. Following that lead, two officers went to 2 John around 6:00 p.m. and saw

[Petitioner] sitting on the stairs. When questioned about his whereabouts earlier that day, Fulton told them he had been at work.

In a subsequent interview, however, Fulton admitted to the police that he had lied about being at work that day. Instead, on the day of the robbery, Fulton had returned to 2 John in the morning after spending the night at his girlfriend's house. He then called in sick to work and spent the rest of the day around the house. At trial, Michael Calcaterra's son corroborated Fulton's story. He testified that Fulton came home that morning, went into his room, and then came out so the two could play video games together in the living room. He further testified that after the games, Fulton returned to his room to watch TV and was home the rest of the day.

At around 3:00 or 3:30 p.m., Michael Calcaterra returned home from work and spent 10-15 minutes in his house before he and his son went next door to cut their neighbor's lawn. The neighbor, Keith Munro, lives on John Avenue. Michael testified that they likely started mowing at around 3:45 p.m. When defense counsel asked Michael's son whether [Petitioner] left the house while they were cutting the lawn, he replied, "No. He only sat on the porch," where he had gone out to smoke.

At 4:19:12 p.m., as police were arriving in the John Avenue neighborhood and seconds after the GPS device was destroyed, [Petitioner] made a 12-second phone call to his sister's girlfriend, Karina Echevarria. Echevarria worked at a Kmart in the same shopping center as the PNC Bank. [Petitioner] occasionally picked Echevarria up from this Kmart and drove her to school.

The government presented this call as a key piece of evidence in its case. Eight months after the robbery, Echevarria testified before a grand jury that

> [Petitioner] called me that day that the bank was robbed an he's like, oh, did you hear? And I'm like, yeah, no. I said no, that I didn't hear, and he told me, he's like, oh, you know, [the bank robbery] happened, you know, [and] Victory Gardens is blocked off, so, I'm like, oh, that's crazy.

Because the police were just beginning to arrive in Fulton's neighborhood at the time he placed this call, the government argues that Echevarria's testimony was probative of his guilt. According

3

to the government, [Petitioner] could not have known about the PNC robbery that occurred just 10 minutes prior to his phone conversation unless he was involved in the crime. [The Third Circuit ultimately agreed, finding Petitioner's knowledge of the robbery as expressed in this call before the robbery's occurrence was publicly known "particularly damning."]

[Petitioner] claimed that he did not call Echevarria to ask about the robbery. Instead, he suggested that she was the one who first told him about the robbery at the PNC Bank. At trial, the government confronted Echevarria with her grand jury testimony and asked her if she remembered who initiated the discussion of the bank robbery. She stated that she could not remember, but she believed [Petitioner] discussed the bank robbery with her during her 4:19:12 phone [conversation] with him that day.

After the initial call from [Petitioner] to Echevarria, Echevarria called [Petitioner] back at 4:25 p.m. That call lasted 50 seconds. At trial, Echevarria testified that she called him back after she went outside to assess what was going on at the PNC Bank.

Based on this information as well as the GPS data, police executed a search warrant at 2 John Avenue on July 5, 2012. They did not find any traces of the GPS nor any other evidence during that search.

. . . .

Investigators first spoke to Ricardo Barnes on July 12, 2012, nearly a month and a half after the robbery. Barnes told officers that he had been hanging out with a close friend, Nicola Gibbs, on the day of the robbery. He testified at trial that he was in the Orange-Irvington area doing some shopping that day. He also stated that Gibbs dropped him off at his mother's house on John [Avenue] in the early evening.

Barnes was unemployed at the time of the robbery. He was doing odd jobs and primarily living with his mother. He had been fired from bank-teller jobs at Bank of America and Wells Fargo bank. He testified that neither Wells Fargo nor Bank of America places GPS tracking devices in the cash stacked in teller's drawers.

[The opinion then presented a table showing the timeline of events between the Calcaterras leaving to cut their neighbor's lawn, the

4

robbery, Fulton's call to Echevarria, and the arrival of Barnes at home during the evening.]

> [Petitioner]'s trial began on January 14, 2014. After hearing all of the evidence, a jury convicted [Petitioner] of the bank robbery [in violation of 8 U.S.C. § 2113(a),] as well as the use of a firearm in furtherance of a crime of violence [in violation of 18 U.S.C. § 924(c)]. He was subsequently sentenced to 57 months in prison for the robbery and 84 consecutive months for the firearm offense.

*United States v. Fulton*, 837 F.3d 281, 284-89 (3d Cir. 2016), *cert. denied*, --- U.S. ---, 139 S. Ct. 214 (2018).

## II. DISCUSSION

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J.

2003).

## B. Analysis

### 1. An evidentiary hearing is not required to resolve Petitioner's claims

A district court need not hold an evidentiary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day,* 969 F.2d 39, 41-42 (3d Cir. 1992). "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." *Judge v. United States,* 119 F. Supp. 3d 270, 280 (D.N.J. 2015); *see also Government of Virgin Islands v. Nicholas,* 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham,* 587 F. App'x 6, 8 (3d Cir. 2014); *Booth,* 432 F.3d at 546. Because all of Petitioner's claims are without merit, no hearing is necessary to resolve this matter. Petitioner's motion seeking an evidentiary hearing (ECF No. 7) is therefore denied.

### 2. Petitioner's ineffective assistance of counsel claims

In his motion, Petitioner raises multiple claims asserting ineffective assistance of counsel. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington,* 466 U.S. 668 (1984). To make out such a claim under *Strickland,* a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick,* 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his

6

defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge*, 119 F. Supp. 3d at 280-81.

In several of his ineffective assistance claims, Petitioner asserts that his trial counsel failed

to investigate and call multiple witnesses whom he believes would have provided testimony that could have aided in his defense, including a witness he believes would have testified that Barnes told her he had just acquired money shortly after the robbery, the woman with whom Barnes stated that he spent the afternoon of the robbery, additional alibi witnesses including the girlfriend of his landlord, other unspecified witnesses he believes would have "proven" he could not have committed the robbery, and an unspecified photogrammetry expert who he believes could have suggested that the robber's head did not match that of Petitioner. In all of these instances, however, Petitioner fails to provide any sworn affidavits or other direct evidence of the testimony these alleged witnesses would have provided had they been called to testify at trial.

Where a petitioner challenges his counsel's decision as to which witnesses to call, courts "are 'required not simply to give [the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did.'" *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014). "*Strickland* requires that a defendant 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' 466 U.S. at 689 (internal quotation marks omitted). If the Government 'can show that counsel actually pursued an *informed* strategy (one decided upon after a thorough investigation of the relevant law and facts),' the effectiveness of counsel's assistance is 'virtually unchallengeable.' *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)." *United States v. Graves*, 613 F. App'x 157, 159 (3d Cir. 2015). Even where a petitioner can show that counsel may have been deficient in his witness calling strategy, he must still show prejudice. Where a petitioner fails to provide a sworn statement indicating what a witness's proposed testimony would have been, however, he cannot establish prejudice by merely providing his own

speculation as to what the witness's testimony could have been. *See Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001); *Judge*, 119 F. Supp. 3d at 285. As Petitioner has failed to provide a sworn statement or other competent evidence of what testimony the alleged uncalled witnesses would have provided, including any evidence that he could have procured an expert let alone one who would have testified that he could not have been the bank robber in this matter, Petitioner has failed to show any prejudice from counsel's alleged failure to call these additional witnesses. Petitioner's witness based ineffective assistance claims therefore provide no basis for relief.

In his next series of claims, Petitioner asserts that trial counsel was unprepared and did not adequately present a defense in the form of either an alibi defense or a defense based on casting blame for the robbery on Barnes. Petitioner, seemingly wishing to relitigate essentially his entire defense, asserts numerous actions he wishes counsel had taken including the calling of additional witnesses as addressed above, the creation of a timeline chart for the jury to suggest Petitioner could not have committed the robbery, challenging Barnes on his testimony that the banks in which he worked hadn't used GPS devices in money drawers, cross examining Barnes on further alleged bad acts which this Court precluded counsel from pursuing for lack of a proper basis for such questioning during Petitioner's trial, and interviewing Barnes prior to trial to discovery more weaknesses to exploit. In making these arguments, however, Petitioner directly relies on numerous pieces of evidence which counsel did elicit at trial, including the testimony of the two alibi witnesses (Anthony Calcaterra and Keith Munro) counsel called at trial, admissions from the Government's witnesses that Barnes may not have answered a call his phone received during the robbery, a stipulation that the banks for which Barnes worked *did* use GPS devices, inconsistencies in Barnes' testimony regarding exactly where he was and whether he had taken his car on the day

9

of the robbery, Barnes' admission during cross-examination that he had written a bad check to Costco for nearly two thousand dollars, and testimony from the Government's witnesses as to the limitations and margin for error in the GPS data presented at trial which presented the jury with the possibility that the GPS device could have been in Barnes' home rather than Petitioner's.

The reason Petitioner relies so heavily on evidence produced by counsel at trial is because his base assertion – that counsel failed to prepare for trial and therefore failed to put on a proper defense in the form of an alibi or third party guilt– is utterly contradicted by the trial record in this matter. Throughout Petitioner's trial, defense counsel sharply and doggedly cross-examined the Government's witnesses, put forward potential alibi witnesses, and did everything that could be expected of them in terms of attempting to present an alibi and lay the blame for the bank robbery at Barnes' feet. Petitioner may well wish that his trial had been the stuff of Hollywood legend and that counsel could have magically convinced Barnes to confess to the bank robbery on the stand, but alas, reality is not an episode of Perry Mason and counsel need not absolutely prove their client's innocence to competently represent a criminal client. All that the law requires is that criminal defense counsel investigate the law and the facts and pursue a reasonable trial strategy based on that review of the facts; where counsel does so his competence is virtually unchallengeable. *Thomas*, 428 F.3d at 500; *Graves*, 613 F. App'x at 159. The record of this matter shows beyond the shadow of a doubt that defense counsel did just that. Throughout the trial, counsel was clearly prepared - even when faced with unexpected witnesses such as the Government's mid-trial decision to call Barnes to the stand. Indeed, as this Court itself noted, counsel often had been able to glean more information about the background of the Government's witnesses, including Barnes, than the Government itself possessed. (*See, e.g.,* Petitioner's

Appellate Appendix at 555, 972). As the record clearly shows that counsel pursued the exact defenses Petitioner now asserts should have been pursued, and as the record likewise clearly indicates that counsel pursued an informed trial strategy in doing so, it is clear that Petitioner's trial counsel was not deficient, and in fact provided Petitioner with a capable defense. As Petitioner has not shown that counsel acted deficiently in pursuing these defenses, and has likewise failed to show that counsel was not prepared for trial, he has failed to establish deficient performance as to these claims, and Petitioner's litany of arguments for why counsel's defense was inadequate are all patently without merit in light of counsel's diligent and able defense of Petitioner at trial.

Although this Court is satisfied that counsel's informed trial strategy and strong defense of Petitioner is more than sufficient to counter Petitioner's claims in sum, this Court will briefly discuss a few of Petitioner's specific defense failure claims in more detail. First, Petitioner argues that counsel failed to adequately investigate and pursue Barnes' criminal history and was thus prevented from bringing further evidence of prior bad acts of Barnes into evidence at trial. Petitioner specifically argues that this Court denied permission to pursue this avenue of questioning because of a "Giglio violation" or a failure to disclose evidence pretrial. Petitioner, however, is mistaken. This Court permitted counsel to question Barnes as to the only prior bad act for which counsel had proffered a good faith basis for cross examination – the bad check at Costco for which Barnes had apparently received a New Jersey disorderly persons offense disposition. (*See, e.g.,* Petitioner's Appellate Appendix at 545-55, 642-45, 696-702). Although counsel had previously discussed other incidents in which he believed that Barnes had been engaged in some kind of fraud at Costco, no evidence which would form as a fair factual basis for

cross-examination was ever presented to this Court – by counsel at trial or by Petitioner in this matter – and thus no cross examination on these ill defined possible prior bad acts was permitted. Although this Court did mention *Giglio* in the context of the discussion of the proposed bad acts cross examination, this Court never found any violation on defense counsel's part in relation to the proposed prior bad acts testimony. As neither defense counsel nor Petitioner have presented any further evidence which would have provided a proper basis for further prior bad act examination of Barnes, this Court did not and would not have permitted further cross examination on speculative rumors of other bad acts, and Petitioner has not shown that counsel was either deficient or that he was prejudiced by any deficiency related to this issue. Counsel pursued, identified, and cross-examined Barnes as to the only prior bad act for which a sufficient factual basis was provided to the Court, and Petitioner therefore has failed to show that counsel was ineffective in relation to this issue.[1]

Petitioner further attempts to fault counsel for failing to more fully cross-examine Barnes as to the use of GPS packed bills by the banks for which Barnes worked, and for "failing" to question Nicola Gibbs to determine if Barnes had been with her as he claimed on the day of the robbery. As with his other witness related claims, Petitioner has utterly failed to provide any evidence that Gibbs would have testified she was not with Barnes, and Petitioner therefore cannot

---

[1] Although this Court did not permit counsel to present this incident as a crime which would permit an instruction to the jury that they could consider at as evidence of Barnes' lack of truthfulness pursuant to Rule 609, this Court did so because it concluded that the disorderly persons offense Barnes received was not a crime sufficient to permit the Rule 609 instruction. (*See* Petitioner's Appellate appendix at 980-88). As this limitation was imposed by this Court, and as counsel presented every available argument in opposition to this Court's ruling, as Petitioner has not provided any evidence that this Court would have ruled differently with further argument, and as this Court would not have ruled differently if faced with Petitioner's own argument, Petitioner can show neither deficient performance nor prejudice as to the Rule 609 issue.

show prejudice from any "failure" to discuss the issue with her or call her as a witness. Likewise, although Petitioner asserts that counsel could have argued with Barnes about the use of GPS trackers by the banks for which he worked based on the stipulation counsel entered into evidence that those banks were clients of the GPS company, any such cross examination would have served no useful purpose, and would have instead seemed combative for combativeness's sake. Counsel did elicit from Barnes that those banks did not use GPS, then presented factual stipulation that they did so, the jury therefore heard information which conflicted with Barnes testimony without the possibility of Barnes refuting cross on the subject by simply stating that he was unaware of it – the likely outcome of any further cross examination or challenge on the GPS subject. Counsel was thus not deficient for failing to argue with Barnes over this issue in light of counsel's clear strategy of challenging Barnes' veracity with the stipulation instead. Petitioner thus fails to establish ineffective assistance on either of these bases.[2]

Petitioner further faults his counsel for "failing" to tell either his girlfriend or his girlfriend's sister that they could contact the U.S. Attorney's office and attempt to change their grand jury testimony with which they were confronted at trial – testimony which included Petitioner's "damning" call in which he admitted knowledge of the bank robbery before the robbery was publicly known. Petitioner argues that, had counsel told these witnesses they could seek to change their grand jury testimony, they would have done so, and provides in his reply a

---

[2] Petitioner's assertion that counsel should have crossed Barnes as to his car similarly fails – that Barnes' car may have been at his mother's home when the robbery investigation occurred was addressed when Barnes stated that he did not take his car and would have parked it to keep it from being repossessed. Petitioner has utterly failed to show that any fruitful or helpful information would have arisen from any such question, and thus cannot show prejudice as to that proposed cross-examination, either.

certification from his girlfriend suggesting she wished to change her testimony. She does not, however, state what testimony she would have sought to provide instead, and regardless of her choice to recant, the Government would still have been free to challenge her and her sister based on the testimony they did provide during the grand jury. Petitioner therefore cannot show any prejudice from this alleged failing. More to the point, both women admitted on the stand that they were told *before they left the grand jury* that they could contact the Government if they wished to change their testimony and did not do so until it came time to testify at trial, at which point they attempted to deny or minimize their testimony in support of Petitioner, leading to the admission of their grand jury testimony. Given that both women were clearly informed that they could contact the Government if they wished to change their testimony, and the lack of any evidence that any change they would have sought to make would have in any way affected this matter, Petitioner does not show prejudice, and cannot establish ineffective assistance on this basis.

In his final ineffective assistance argument based on counsel's defense and preparation, Petitioner attempts to argue that counsel proved deficient in relation to the GPS data and the expert witness testimony regarding that data. Specifically, Petitioner fault counsel for suggesting that the data would place Barnes' phone in the bank parking lot near the time of the robbery and for "misunderstanding" the proposed testimony of Fuller. Although counsel's expert could not place Barnes' phone in the parking lot specifically, counsel was able to obtain testimony that placed Barnes' phone near the bank and his mother's home, and not several towns away, half an hour before the robbery. Given counsel's presentation of this evidence, and the lack of any evidence that the outcome of trial would have been different had counsel not overstated the evidence by saying the phone would be placed in the parking lot of the bank rather than in the area containing

the bank, Petitioner cannot show prejudice as to counsel's statement to that effect. Likewise, counsel's cross examination of Fuller, the Government's GPS expert, was competent and thorough. Counsel produced admissions from Fuller that Fuller did not fully understand that Barnes' and Petitioner's homes were conjoined residences, that the GPS data had limited accuracy and the GPS therefore could possibly have been in Barnes' section of the building rather than Petitioner's. Counsel thus produced the information Petitioner now states should have been placed into evidence, and Petitioner has not shown that any further fruitful testimony could have been gleaned from Fuller. Because Petitioner has not presented any evidence to show that the outcome of trial would have been different had counsel more thoroughly cross-examined Fuller on the GPS issue, Petitioner has failed to show prejudice on this basis. Thus, as with all of Petitioner's other claims that counsel was unprepared or did not present a defense, this claim is without merit and provides no basis for relief. Petitioner has utterly failed to show that he received ineffective assistance of counsel, and the record clearly indicates that he received more than adequate assistance from his trial attorneys. Petitioner's ineffective assistance claims are therefore all denied.

### 3. Petitioner's *Davis* claim

Following the briefing in this matter, Petitioner filed a motion to "expedite" this proceeding, in which he argues that, following the Supreme Court's decision in *United States v. Davis*, --- U.S. ---, 139 S. Ct. 2319 (2019), his conviction for the possession of a weapon in furtherance of a crime of violence pursuant to 18 U.S.C. § 924(c) is invalid as his bank robbery offense no longer qualifies as a crime of violence under the statute's now void residual clause. Although *Davis* did overturn the statute's residual clause as unconstitutionally vague, the Court

left in place the statute's elements clause. Under that clause, a crime of violence sufficient to warrant a conviction under § 924(c) is one which "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). In *United States v. Wilson*, 880 F.3d 80 (3d Cir. 2018), the Third Circuit held that bank robbery through intimidation in violation of 18 U.S.C. § 2113(a), the offense of which Petitioner was convicted which undergirds his use of a weapon during a crime of violence charge, *is* a crime of violence under the essentially identical elements clause of the Career Offender Sentencing guidelines as the least culpable conduct under the statute, robbery via intimidation, by its very nature includes a threat of violence should the victim resist the robbery. As it is clear from *Wilson* that bank robbery by intimidation clearly meets the elements clause of § 924(c), Petitioner's underlying conviction for bank robbery *is* a crime of violence regardless of the overturning of the residual clause of the statute in *Davis*. Petitioner's conviction remains a crime of violence notwithstanding *Davis*, and Petitioner's claim that his § 924(c) conviction is unlawful is thus utterly without merit. Petitioner's *Davis* claim is denied. Because both Petitioner's motion to expedite and his procedurally faulty motion for a default judgment (ECF Nos. 9, 10) both presented only Petitioner's *Davis* claim, those motions are also denied as Petitioner's claim is without merit.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could

conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason could not disagree with this Court's conclusion that Petitioner's claims are without merit, Petitioner has failed to make a substantial showing of the denial of a constitutional right, and no certificate of appealability shall issue.

## IV. CONCLUSION

For the reasons stated above, Petitioner's motion to vacate sentence (ECF No. 1) is DENIED, Petitioner's outstanding motions (ECF Nos. 7, 9, 10) are DENIED, and Petitioner is DENIED a certificate of appealability.   An appropriate order follows.

Hon. Stanley R. Chesler
United States District Judge

*NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAHMAN R. FULTON, | : | |
| | : | Civil Action No. 18-16526 (SRC) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**CHESLER**, District Judge:

Presently before the Court is Petitioner Rahman R. Fulton's motion to vacate his sentence brought pursuant to 28 U.S.C. § 2255. (ECF No. 1). Following an order to answer, the Government filed responses to the motion (ECF No. 6, 11), to which Petitioner replied in the form of a reply brief and motions for an evidentiary hearing, to expedite this matter, and for the entry of a "default" judgment. (ECF Nos. 7, 8, 9, 10). For the reasons set forth below, this Court will deny Petitioner's motion to vacate sentence, deny Petitioner's remaining motions, and deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction and sentence, the Court of Appeals for the Third Circuit summarized the factual background of this matter as follows:

> On May 25, 2012, a large man who appeared to be wearing multiple layers of clothing entered the PNC Bank in North Randolph, [New Jersey,] carrying a gun. He ordered everyone to the ground and demanded money from the tellers' second drawers. Two PNC employees quickly handed him two stacks of cash, one of which contained a concealed Global Positioning System tracking device. The robber's face was completely covered by a ski mask. The

robber's height was estimated as being anywhere from 6 feet to 6 foot 3 inches. One employee described him as having a "medium build" and being "solid," but admitted she "couldn't really totally tell [if he was] muscular or not because [of] the way [he] was covered." She estimated his weight at 220 to 230 pounds. Another employee described him as "a husky man, built" and "not necessarily fat but, you know, muscular." She said it was hard to tell his build because of his bulky clothing. The robbery occurred at 4:08 p.m., and lasted a matter of minutes. The GPS device hidden inside the stack of bills activated as soon as it was removed from the teller's drawer. After the robber fled, the GPS device quickly led law enforcement officers to the neighboring town of Victory Gardens. Within minutes, dozens of police officers swarmed the area. The signals from the GPS then directed police to a building at 1 Jane Avenue. When police arrived at that location, they discovered fragments of the GPS in the backyard. Based on the GPS data, the government's GPS expert testified at trial that the GPS was "disrupted" – likely smashed – between 4:18:37 and 4:18:53 p.m. Police did not recover any fingerprints of evidentiary value on the fragments.

Subsequent analysis of the GPS data led law enforcement to two suspects: [Petitioner] and Ricardo Barnes. The GPS had signaled its location at 2-6 John Avenue immediately before it had been destroyed. [Petitioner] and Barnes lived in opposite halves of a house located at that address. Two John Avenue was owned by Michael Calcaterra, who rented a room to [Petitioner], while the 6 John half belonged to Barnes' mother, with whom Barnes lived. [The opinion thereafter contained a diagram of the building showing two connected residences with a backyard that bordered the yard in which the smashed GPS had been discovered.]

. . . .

At the time of the robbery, [Petitioner] was employed as a sanitation worker for the Morris County Municipal Utilities Authority. Despite this source of income, he was slightly behind on his rent payments and owed his girlfriend some money.

Officers first spoke to Fulton on the day of the robbery as they canvassed the Jane and John Avenue area after locating the GPS. By then, Officer Edelman had heard a report that someone fitting the description of the perpetrator lived at 2 John. Following that lead, two officers went to 2 John around 6:00 p.m. and saw

[Petitioner] sitting on the stairs. When questioned about his whereabouts earlier that day, Fulton told them he had been at work.

In a subsequent interview, however, Fulton admitted to the police that he had lied about being at work that day. Instead, on the day of the robbery, Fulton had returned to 2 John in the morning after spending the night at his girlfriend's house. He then called in sick to work and spent the rest of the day around the house. At trial, Michael Calcaterra's son corroborated Fulton's story. He testified that Fulton came home that morning, went into his room, and then came out so the two could play video games together in the living room. He further testified that after the games, Fulton returned to his room to watch TV and was home the rest of the day.

At around 3:00 or 3:30 p.m., Michael Calcaterra returned home from work and spent 10-15 minutes in his house before he and his son went next door to cut their neighbor's lawn. The neighbor, Keith Munro, lives on John Avenue. Michael testified that they likely started mowing at around 3:45 p.m. When defense counsel asked Michael's son whether [Petitioner] left the house while they were cutting the lawn, he replied, "No. He only sat on the porch," where he had gone out to smoke.

At 4:19:12 p.m., as police were arriving in the John Avenue neighborhood and seconds after the GPS device was destroyed, [Petitioner] made a 12-second phone call to his sister's girlfriend, Karina Echevarria. Echevarria worked at a Kmart in the same shopping center as the PNC Bank. [Petitioner] occasionally picked Echevarria up from this Kmart and drove her to school.

The government presented this call as a key piece of evidence in its case. Eight months after the robbery, Echevarria testified before a grand jury that

> [Petitioner] called me that day that the bank was robbed an he's like, oh, did you hear? And I'm like, yeah, no. I said no, that I didn't hear, and he told me, he's like, oh, you know, [the bank robbery] happened, you know, [and] Victory Gardens is blocked off, so, I'm like, oh, that's crazy.

Because the police were just beginning to arrive in Fulton's neighborhood at the time he placed this call, the government argues that Echevarria's testimony was probative of his guilt. According

3

to the government, [Petitioner] could not have known about the PNC robbery that occurred just 10 minutes prior to his phone conversation unless he was involved in the crime. [The Third Circuit ultimately agreed, finding Petitioner's knowledge of the robbery as expressed in this call before the robbery's occurrence was publicly known "particularly damning."]

[Petitioner] claimed that he did not call Echevarria to ask about the robbery. Instead, he suggested that she was the one who first told him about the robbery at the PNC Bank. At trial, the government confronted Echevarria with her grand jury testimony and asked her if she remembered who initiated the discussion of the bank robbery. She stated that she could not remember, but she believed [Petitioner] discussed the bank robbery with her during her 4:19:12 phone [conversation] with him that day.

After the initial call from [Petitioner] to Echevarria, Echevarria called [Petitioner] back at 4:25 p.m. That call lasted 50 seconds. At trial, Echevarria testified that she called him back after she went outside to assess what was going on at the PNC Bank.

Based on this information as well as the GPS data, police executed a search warrant at 2 John Avenue on July 5, 2012. They did not find any traces of the GPS nor any other evidence during that search.

. . . .

Investigators first spoke to Ricardo Barnes on July 12, 2012, nearly a month and a half after the robbery. Barnes told officers that he had been hanging out with a close friend, Nicola Gibbs, on the day of the robbery. He testified at trial that he was in the Orange-Irvington area doing some shopping that day. He also stated that Gibbs dropped him off at his mother's house on John [Avenue] in the early evening.

Barnes was unemployed at the time of the robbery. He was doing odd jobs and primarily living with his mother. He had been fired from bank-teller jobs at Bank of America and Wells Fargo bank. He testified that neither Wells Fargo nor Bank of America places GPS tracking devices in the cash stacked in teller's drawers.

[The opinion then presented a table showing the timeline of events between the Calcaterras leaving to cut their neighbor's lawn, the

4

robbery, Fulton's call to Echevarria, and the arrival of Barnes at home during the evening.]

[Petitioner]'s trial began on January 14, 2014. After hearing all of the evidence, a jury convicted [Petitioner] of the bank robbery [in violation of 8 U.S.C. § 2113(a),] as well as the use of a firearm in furtherance of a crime of violence [in violation of 18 U.S.C. § 924(c)]. He was subsequently sentenced to 57 months in prison for the robbery and 84 consecutive months for the firearm offense.

*United States v. Fulton*, 837 F.3d 281, 284-89 (3d Cir. 2016), *cert. denied*, --- U.S. ---, 139 S. Ct. 214 (2018).

## II. DISCUSSION

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J.

2003).

## B. Analysis

### 1. An evidentiary hearing is not required to resolve Petitioner's claims

A district court need not hold an evidentiary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day,* 969 F.2d 39, 41-42 (3d Cir. 1992). "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." *Judge v. United States,* 119 F. Supp. 3d 270, 280 (D.N.J. 2015); *see also Government of Virgin Islands v. Nicholas,* 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham,* 587 F. App'x 6, 8 (3d Cir. 2014); *Booth,* 432 F.3d at 546. Because all of Petitioner's claims are without merit, no hearing is necessary to resolve this matter. Petitioner's motion seeking an evidentiary hearing (ECF No. 7) is therefore denied.

### 2. Petitioner's ineffective assistance of counsel claims

In his motion, Petitioner raises multiple claims asserting ineffective assistance of counsel. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington,* 466 U.S. 668 (1984). To make out such a claim under *Strickland,* a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick,* 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his

6

defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge*, 119 F. Supp. 3d at 280-81.

In several of his ineffective assistance claims, Petitioner asserts that his trial counsel failed

to investigate and call multiple witnesses whom he believes would have provided testimony that could have aided in his defense, including a witness he believes would have testified that Barnes told her he had just acquired money shortly after the robbery, the woman with whom Barnes stated that he spent the afternoon of the robbery, additional alibi witnesses including the girlfriend of his landlord, other unspecified witnesses he believes would have "proven" he could not have committed the robbery, and an unspecified photogrammetry expert who he believes could have suggested that the robber's head did not match that of Petitioner. In all of these instances, however, Petitioner fails to provide any sworn affidavits or other direct evidence of the testimony these alleged witnesses would have provided had they been called to testify at trial.

Where a petitioner challenges his counsel's decision as to which witnesses to call, courts "are 'required not simply to give [the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did.'" *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014). "*Strickland* requires that a defendant 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' 466 U.S. at 689 (internal quotation marks omitted). If the Government 'can show that counsel actually pursued an *informed* strategy (one decided upon after a thorough investigation of the relevant law and facts),' the effectiveness of counsel's assistance is 'virtually unchallengeable.' *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)." *United States v. Graves*, 613 F. App'x 157, 159 (3d Cir. 2015). Even where a petitioner can show that counsel may have been deficient in his witness calling strategy, he must still show prejudice. Where a petitioner fails to provide a sworn statement indicating what a witness's proposed testimony would have been, however, he cannot establish prejudice by merely providing his own

speculation as to what the witness's testimony could have been. *See Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001); *Judge*, 119 F. Supp. 3d at 285. As Petitioner has failed to provide a sworn statement or other competent evidence of what testimony the alleged uncalled witnesses would have provided, including any evidence that he could have procured an expert let alone one who would have testified that he could not have been the bank robber in this matter, Petitioner has failed to show any prejudice from counsel's alleged failure to call these additional witnesses. Petitioner's witness based ineffective assistance claims therefore provide no basis for relief.

In his next series of claims, Petitioner asserts that trial counsel was unprepared and did not adequately present a defense in the form of either an alibi defense or a defense based on casting blame for the robbery on Barnes. Petitioner, seemingly wishing to relitigate essentially his entire defense, asserts numerous actions he wishes counsel had taken including the calling of additional witnesses as addressed above, the creation of a timeline chart for the jury to suggest Petitioner could not have committed the robbery, challenging Barnes on his testimony that the banks in which he worked hadn't used GPS devices in money drawers, cross examining Barnes on further alleged bad acts which this Court precluded counsel from pursuing for lack of a proper basis for such questioning during Petitioner's trial, and interviewing Barnes prior to trial to discovery more weaknesses to exploit. In making these arguments, however, Petitioner directly relies on numerous pieces of evidence which counsel did elicit at trial, including the testimony of the two alibi witnesses (Anthony Calcaterra and Keith Munro) counsel called at trial, admissions from the Government's witnesses that Barnes may not have answered a call his phone received during the robbery, a stipulation that the banks for which Barnes worked *did* use GPS devices, inconsistencies in Barnes' testimony regarding exactly where he was and whether he had taken his car on the day

of the robbery, Barnes' admission during cross-examination that he had written a bad check to Costco for nearly two thousand dollars, and testimony from the Government's witnesses as to the limitations and margin for error in the GPS data presented at trial which presented the jury with the possibility that the GPS device could have been in Barnes' home rather than Petitioner's.

The reason Petitioner relies so heavily on evidence produced by counsel at trial is because his base assertion – that counsel failed to prepare for trial and therefore failed to put on a proper defense in the form of an alibi or third party guilt– is utterly contradicted by the trial record in this matter. Throughout Petitioner's trial, defense counsel sharply and doggedly cross-examined the Government's witnesses, put forward potential alibi witnesses, and did everything that could be expected of them in terms of attempting to present an alibi and lay the blame for the bank robbery at Barnes' feet. Petitioner may well wish that his trial had been the stuff of Hollywood legend and that counsel could have magically convinced Barnes to confess to the bank robbery on the stand, but alas, reality is not an episode of Perry Mason and counsel need not absolutely prove their client's innocence to competently represent a criminal client. All that the law requires is that criminal defense counsel investigate the law and the facts and pursue a reasonable trial strategy based on that review of the facts; where counsel does so his competence is virtually unchallengeable. *Thomas*, 428 F.3d at 500; *Graves*, 613 F. App'x at 159. The record of this matter shows beyond the shadow of a doubt that defense counsel did just that. Throughout the trial, counsel was clearly prepared - even when faced with unexpected witnesses such as the Government's mid-trial decision to call Barnes to the stand. Indeed, as this Court itself noted, counsel often had been able to glean more information about the background of the Government's witnesses, including Barnes, than the Government itself possessed. (*See, e.g.,* Petitioner's

Appellate Appendix at 555, 972). As the record clearly shows that counsel pursued the exact defenses Petitioner now asserts should have been pursued, and as the record likewise clearly indicates that counsel pursued an informed trial strategy in doing so, it is clear that Petitioner's trial counsel was not deficient, and in fact provided Petitioner with a capable defense. As Petitioner has not shown that counsel acted deficiently in pursuing these defenses, and has likewise failed to show that counsel was not prepared for trial, he has failed to establish deficient performance as to these claims, and Petitioner's litany of arguments for why counsel's defense was inadequate are all patently without merit in light of counsel's diligent and able defense of Petitioner at trial.

Although this Court is satisfied that counsel's informed trial strategy and strong defense of Petitioner is more than sufficient to counter Petitioner's claims in sum, this Court will briefly discuss a few of Petitioner's specific defense failure claims in more detail. First, Petitioner argues that counsel failed to adequately investigate and pursue Barnes' criminal history and was thus prevented from bringing further evidence of prior bad acts of Barnes into evidence at trial. Petitioner specifically argues that this Court denied permission to pursue this avenue of questioning because of a "Giglio violation" or a failure to disclose evidence pretrial. Petitioner, however, is mistaken. This Court permitted counsel to question Barnes as to the only prior bad act for which counsel had proffered a good faith basis for cross examination – the bad check at Costco for which Barnes had apparently received a New Jersey disorderly persons offense disposition. (*See, e.g.,* Petitioner's Appellate Appendix at 545-55, 642-45, 696-702). Although counsel had previously discussed other incidents in which he believed that Barnes had been engaged in some kind of fraud at Costco, no evidence which would form as a fair factual basis for

11

cross-examination was ever presented to this Court – by counsel at trial or by Petitioner in this matter – and thus no cross examination on these ill defined possible prior bad acts was permitted. Although this Court did mention *Giglio* in the context of the discussion of the proposed bad acts cross examination, this Court never found any violation on defense counsel's part in relation to the proposed prior bad acts testimony. As neither defense counsel nor Petitioner have presented any further evidence which would have provided a proper basis for further prior bad act examination of Barnes, this Court did not and would not have permitted further cross examination on speculative rumors of other bad acts, and Petitioner has not shown that counsel was either deficient or that he was prejudiced by any deficiency related to this issue. Counsel pursued, identified, and cross-examined Barnes as to the only prior bad act for which a sufficient factual basis was provided to the Court, and Petitioner therefore has failed to show that counsel was ineffective in relation to this issue.[1]

Petitioner further attempts to fault counsel for failing to more fully cross-examine Barnes as to the use of GPS packed bills by the banks for which Barnes worked, and for "failing" to question Nicola Gibbs to determine if Barnes had been with her as he claimed on the day of the robbery. As with his other witness related claims, Petitioner has utterly failed to provide any evidence that Gibbs would have testified she was not with Barnes, and Petitioner therefore cannot

---

[1] Although this Court did not permit counsel to present this incident as a crime which would permit an instruction to the jury that they could consider at as evidence of Barnes' lack of truthfulness pursuant to Rule 609, this Court did so because it concluded that the disorderly persons offense Barnes received was not a crime sufficient to permit the Rule 609 instruction. (*See* Petitioner's Appellate appendix at 980-88). As this limitation was imposed by this Court, and as counsel presented every available argument in opposition to this Court's ruling, as Petitioner has not provided any evidence that this Court would have ruled differently with further argument, and as this Court would not have ruled differently if faced with Petitioner's own argument, Petitioner can show neither deficient performance nor prejudice as to the Rule 609 issue.

show prejudice from any "failure" to discuss the issue with her or call her as a witness. Likewise, although Petitioner asserts that counsel could have argued with Barnes about the use of GPS trackers by the banks for which he worked based on the stipulation counsel entered into evidence that those banks were clients of the GPS company, any such cross examination would have served no useful purpose, and would have instead seemed combative for combativeness's sake. Counsel did elicit from Barnes that those banks did not use GPS, then presented factual stipulation that they did so, the jury therefore heard information which conflicted with Barnes testimony without the possibility of Barnes refuting cross on the subject by simply stating that he was unaware of it – the likely outcome of any further cross examination or challenge on the GPS subject. Counsel was thus not deficient for failing to argue with Barnes over this issue in light of counsel's clear strategy of challenging Barnes' veracity with the stipulation instead. Petitioner thus fails to establish ineffective assistance on either of these bases.[2]

Petitioner further faults his counsel for "failing" to tell either his girlfriend or his girlfriend's sister that they could contact the U.S. Attorney's office and attempt to change their grand jury testimony with which they were confronted at trial – testimony which included Petitioner's "damning" call in which he admitted knowledge of the bank robbery before the robbery was publicly known. Petitioner argues that, had counsel told these witnesses they could seek to change their grand jury testimony, they would have done so, and provides in his reply a

---

[2] Petitioner's assertion that counsel should have crossed Barnes as to his car similarly fails – that Barnes' car may have been at his mother's home when the robbery investigation occurred was addressed when Barnes stated that he did not take his car and would have parked it to keep it from being repossessed. Petitioner has utterly failed to show that any fruitful or helpful information would have arisen from any such question, and thus cannot show prejudice as to that proposed cross-examination, either.

certification from his girlfriend suggesting she wished to change her testimony. She does not, however, state what testimony she would have sought to provide instead, and regardless of her choice to recant, the Government would still have been free to challenge her and her sister based on the testimony they did provide during the grand jury. Petitioner therefore cannot show any prejudice from this alleged failing. More to the point, both women admitted on the stand that they were told *before they left the grand jury* that they could contact the Government if they wished to change their testimony and did not do so until it came time to testify at trial, at which point they attempted to deny or minimize their testimony in support of Petitioner, leading to the admission of their grand jury testimony. Given that both women were clearly informed that they could contact the Government if they wished to change their testimony, and the lack of any evidence that any change they would have sought to make would have in any way affected this matter, Petitioner does not show prejudice, and cannot establish ineffective assistance on this basis.

In his final ineffective assistance argument based on counsel's defense and preparation, Petitioner attempts to argue that counsel proved deficient in relation to the GPS data and the expert witness testimony regarding that data. Specifically, Petitioner fault counsel for suggesting that the data would place Barnes' phone in the bank parking lot near the time of the robbery and for "misunderstanding" the proposed testimony of Fuller. Although counsel's expert could not place Barnes' phone in the parking lot specifically, counsel was able to obtain testimony that placed Barnes' phone near the bank and his mother's home, and not several towns away, half an hour before the robbery. Given counsel's presentation of this evidence, and the lack of any evidence that the outcome of trial would have been different had counsel not overstated the evidence by saying the phone would be placed in the parking lot of the bank rather than in the area containing

the bank, Petitioner cannot show prejudice as to counsel's statement to that effect. Likewise, counsel's cross examination of Fuller, the Government's GPS expert, was competent and thorough. Counsel produced admissions from Fuller that Fuller did not fully understand that Barnes' and Petitioner's homes were conjoined residences, that the GPS data had limited accuracy and the GPS therefore could possibly have been in Barnes' section of the building rather than Petitioner's. Counsel thus produced the information Petitioner now states should have been placed into evidence, and Petitioner has not shown that any further fruitful testimony could have been gleaned from Fuller. Because Petitioner has not presented any evidence to show that the outcome of trial would have been different had counsel more thoroughly cross-examined Fuller on the GPS issue, Petitioner has failed to show prejudice on this basis. Thus, as with all of Petitioner's other claims that counsel was unprepared or did not present a defense, this claim is without merit and provides no basis for relief. Petitioner has utterly failed to show that he received ineffective assistance of counsel, and the record clearly indicates that he received more than adequate assistance from his trial attorneys. Petitioner's ineffective assistance claims are therefore all denied.

**3. Petitioner's *Davis* claim**

Following the briefing in this matter, Petitioner filed a motion to "expedite" this proceeding, in which he argues that, following the Supreme Court's decision in *United States v. Davis*, --- U.S. ---, 139 S. Ct. 2319 (2019), his conviction for the possession of a weapon in furtherance of a crime of violence pursuant to 18 U.S.C. § 924(c) is invalid as his bank robbery offense no longer qualifies as a crime of violence under the statute's now void residual clause. Although *Davis* did overturn the statute's residual clause as unconstitutionally vague, the Court

left in place the statute's elements clause. Under that clause, a crime of violence sufficient to warrant a conviction under § 924(c) is one which "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). In *United States v. Wilson*, 880 F.3d 80 (3d Cir. 2018), the Third Circuit held that bank robbery through intimidation in violation of 18 U.S.C. § 2113(a), the offense of which Petitioner was convicted which undergirds his use of a weapon during a crime of violence charge, *is* a crime of violence under the essentially identical elements clause of the Career Offender Sentencing guidelines as the least culpable conduct under the statute, robbery via intimidation, by its very nature includes a threat of violence should the victim resist the robbery. As it is clear from *Wilson* that bank robbery by intimidation clearly meets the elements clause of § 924(c), Petitioner's underlying conviction for bank robbery *is* a crime of violence regardless of the overturning of the residual clause of the statute in *Davis*. Petitioner's conviction remains a crime of violence notwithstanding *Davis*, and Petitioner's claim that his § 924(c) conviction is unlawful is thus utterly without merit. Petitioner's *Davis* claim is denied. Because both Petitioner's motion to expedite and his procedurally faulty motion for a default judgment (ECF Nos. 9, 10) both presented only Petitioner's *Davis* claim, those motions are also denied as Petitioner's claim is without merit.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could

conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason could not disagree with this Court's conclusion that Petitioner's claims are without merit, Petitioner has failed to make a substantial showing of the denial of a constitutional right, and no certificate of appealability shall issue.

## IV. CONCLUSION

For the reasons stated above, Petitioner's motion to vacate sentence (ECF No. 1) is DENIED, Petitioner's outstanding motions (ECF Nos. 7, 9, 10) are DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

Hon. Stanley R. Chesler
United States District Judge